**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 18, 2014**

# In the Court of Appeals of Georgia

A14A0785. WIGGINS v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Rebecca Wiggins of sexual exploitation of children, aggravated sodomy, child molestation, and cruelty to children in the first degree, and after merging the last two offenses with the sodomy offense, she was sentenced to life in prison on the aggravated sodomy count and to twenty years consecutively on the exploitation count. On appeal, she enumerates seven errors, contending among other things that the evidence was insufficient and that the trial court erred in failing to exercise its discretion under OCGA §§ 5-5-20 and 5-5-21. Although the evidence was sufficient, the trial court did not exercise its discretion and weigh the evidence under the general grounds. Accordingly, we must vacate the denial of Wiggins' motion for new trial and remand for further proceedings that are consistent with this opinion.

Wiggins was indicted on four counts: (1) sexual exploitation of children between November 17, 2001 and November 16, 2003 for using and enticing a minor, N.G., to lewdly exhibit her genitals for the purpose of producing a photograph; (2) for aggravated sodomy between February 25, 2004, and September 30, 2004; by aiding and encouraging David Ray to perform an act of sodomy with N.G., who was younger than ten; (3) for child molestation during the same time period as counts 2 and 3 by taking N.G. to Ray's home and holding her while Ray sodomized the child; and (4) for cruelty to children in the first degree during that time period by causing N.G. excessive mental pain by taking her to Ray's home and holding her hand while Ray sodomized the child.

When determining whether the State presented sufficient evidence to support a criminal conviction,

> [w]e view the evidence in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence. We do not weigh the evidence or determine witness credibility, but only determine if the evidence was sufficient for a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.

*Valentine v. Smith*, 301 Ga. App. 630, 630-631 (689 SE2d 76) (2009).

So viewed, the evidence at trial established that N.G. and her younger sisters T.W. and M.W. first came to the attention of authorities in Savannah when the police responded to a "domestic violence with an injury" call. The children's mother had a red mark on her face, as if someone had hit her, and the children recounted that the mother's boyfriend, Cesar Moran, had been hitting the mother. After Moran was arrested and placed in the patrol car, T.W. and N.G. approached an officer and reported that Moran had been molesting them. Because under police department rules only a Special Victims' Unit (SVU) officer could take out a warrant against Moran for molestation, Moran was charged only with misdemeanor battery and was allowed to bond out of jail before additional charges were brought against him.

A Savannah SVU detective assigned to the case interviewed the two older girls, N.G. and T.W., two days later. T.W., who was eight then, made reference to several men involved in their lives: David Wiggins, David Ray, and Moran. Specifically, T.W. disclosed that Ray was her mother's "sugar daddy" and had bought her new clothes for school, then described the physical altercation with Moran that led to the police being called. She further disclosed that three men had molested her, beginning when she was five with David Wiggins, who is the defendant Rebecca Wiggins' brother and had previously lived with the children and their mother but was in jail

3

when the girls were being interviewed. T.W. then talked about having to spend the night with Ray at his house in Marietta, and Ray having taken pictures of her private area.

The detective then interviewed N.G., who was eleven then. N.G. said Moran had not molested her, only hit her, but that David Wiggins had anally sodomized her for "[q]uite a few years," beginning when she was seven. When the detective asked about Ray, N.G. sat quietly for a time, then went back to talking about David Wiggins.

The detective obtained an arrest warrant for Moran for child molestation, and eventually U.S. Marshals tracked him to a country outside the United States. The warrant was outstanding as of the trial in August 2011. In December 2008, N.G. told her therapist that she was excited about the defendant, her "Aunt Becka," coming to visit, and named her aunt as someone on her "safe place list." Then in January 2009, the therapist referred to the girls' intake notes and asked N.G. to tell her about Ray. N.G. went white and asked how the therapist knew about him. After the therapist responded that N.G.'s sister had made some disclosures about Ray, N.G. for the first time disclosed that the defendant used to obtain money from Ray in exchange for N.G. performing sexual acts with him.

4

The therapist testified that N.G. said her mother also obtained money from Ray and described a weekend when Ray took N.G. and T.W. shopping for new school things in exchange for her and T.W. staying overnight at Ray's house while her mother and youngest sister stayed at a motel. N.G. said she locked the girls' bedroom door but Ray got inside the room anyway. At the next therapy session, N.G. disclosed that Ray had anally sodomized T.W. that night, and said, "I didn't know how to help her or what to do."

N.G. told the therapist that she and her sisters lived with the defendant for about two years while her mother was incarcerated. She said the defendant would tell her they "were going to get two hundred to three hundred to four hundred dollars, and all I had to do was give [Ray] blow jobs," although at the time she was only seven and did not know what that meant. N.G. reported that the defendant took naked pictures of her and gave them to Ray. The therapist testified that N.G. said that the defendant told her about being molested by her drunken father and other abuse she had suffered as a child. Finally in a session in mid-February 2009, N.G. told her therapist that she had been to Ray's house six or eight times and described one incident during which the defendant bathed her in Ray's tub and placed her on Ray's bed, where he tried unsuccessfully to penetrate her anally. N.G. told her therapist that

5

the defendant held her hand and told her it would be okay, and then Ray placed his mouth on N.G.'s vagina. N.G. described other sexual acts she performed on Ray, and described his house in great detail, details later confirmed by other witnesses.

The girls were interviewed a second time by another specialist in February 2009 because of their continued disclosures during therapy. In a subsequent session N.G. said that the defendant told her not to tell what was going on with Ray because the defendant would go to jail, the girls would go into county custody, and they would never see their mother again. The defendant told N.G. that if she did not perform sexual acts with Ray, the family would have no food and would lose their house.

Ray's wife testified that in March 2009, she was out of town when Ray called to tell her he was going to be accused of child molestation. When she returned home, he told her he had been "involved" with a family composed of a mother, an aunt, a boyfriend, and two girls who were accusing him of molestation. He also told his wife that he had let them come to the house and then gave them money to get an apartment because the mother was a drug addict and the children were going to be taken from her. Shortly after this disclosure, the police executed a search warrant at Ray's house, and on April 4, 2009, Ray killed himself in his back yard with a shotgun.

6

A records custodian from Western Union authenticated documents showing that Ray had transferred money to both the defendant and the children's mother. A detective reviewed the Western Union data and determined that Ray sent the mother a total of $54,568 beginning in June 2005, and sent the defendant a total of $9,085 beginning in March 2004 and ending in December 2008.

The State played portions of N.G.'s two forensic interviews during the direct examination of the interviewers, and Wiggins played the entire first interview.[1] N.G. testified, confirming what she said in the interviews and to her therapist. For example, she testified that when she was six or seven, her aunt took photographs of her naked with her legs spread and gave them to Ray. In 2004, N.G.'s mother went to jail and the girls lived with the defendant, who took N.G. to Ray's house eight to ten times, where he would touch her vagina and try to insert his private part in her butt while the defendant was present. The defendant bathed N.G. beforehand, told her that it would not hurt, and held her hand while Ray sodomized her. The defendant moved to Savannah with the three girls, where David Wiggins lived with them for a time and molested N.G. until he went to jail in 2008 and N.G. went into foster care. (Wiggins

---

[1]While the recorded interviews were not transcribed when they were played during the trial, this Court has reviewed the recordings themselves.

was the father of N.G.'s youngest sister, M.W.) N.G. initially did not tell her therapist about Ray because she had promised the defendant that she would not do so.

After the Savannah detective interviewed David Wiggins in July 2009, she administratively closed her investigation of him by referring the case to the district attorney's office and requesting that he be arrested, but that office did not want her to take out a warrant. An arrest warrant for the children's mother was outstanding as of trial, as was the warrant against Moran. This defendant is thus the only party involved in these crimes who had been prosecuted as of her trial in August 2011.

(a) In arguing that the evidence was insufficient to sustain the convictions, Wiggins first notes that the State never introduced any photographs to support the charge of sexual exploitation of children by enticing N.G. to engage in a lewd exhibition of her genitals to produce a photograph. N.G. testified that Wiggins used a Polaroid camera to take photographs of her with her legs spread and then sent the pictures to Ray, and that evidence is sufficient to sustain that conviction.

(b) As to the counts of aggravated sodomy, child molestation, and cruelty to children, which were merged for sentencing, Wiggins argues that the indictment accused David Ray of performing the actual act of sodomy, and therefore Wiggins' convictions were "presumably based upon her being a party to the crime." While N.G.

8

testified that the acts took place at Ray's home, Wiggins argued that N.G. could have become familiar with the house when her mother took her there and her sister was molested, and that coupled with the evidence that Wiggins was molested as a child and had sex with Ray for money, "you have more prejudicial facts than probative ones, not to mention the lapse of time from the events to trial and the intervening molestations by two other men."

"Resolving evidentiary conflicts and inconsistencies and assessing witness credibility are the province of the fact finder, not the appellate court." *Browner v. State*, ___ Ga. ___ (Case No. S14A1689, decided Nov. 3, 2014). The above-summarized evidence was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of the offenses charged as a party to the crimes. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

(c) Wiggins also argues that the trial court's standard of review was erroneous on her challenge to the verdict on the general grounds. Wiggins asserted in her initial motion for new trial the general grounds that the verdict was "decidedly and strongly against the weight of the evidence" and that it was "contrary to the law and principles of justice and equity." She also argued that the evidence against her was insufficient to sustain the convictions. In its order denying Wiggins' motion for a new trial, the

9

trial court applied only the *Jackson v. Virginia* standard in rejecting her assertions as

follows:

> The evidence was sufficient to support the verdict. . . . *Jackson v.
> Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); OCGA §
> 5-5-20; OCGA § 5-5-21. See also *Valentine v. State*, 301 Ga. App. 630
> [689 SE2d 76] (2009) (mother of victims properly convicted of child
> molestation and aggravated child molestation for aiding and abetting
> housemate in sexual abuse of children.)

When considering a motion for new trial, the trial court must apply different

standards of review for claims that the evidence was insufficient and claims made

under "the general grounds." These standards "address two distinct legal issues,

illustrated by the fact that the double jeopardy clause applies when a court finds the

evidence insufficient, but not when a court holds that the verdict was against the

weight of the evidence." *Manuel v. State*, 289 Ga. 383, 386-387 (2) (711 SE2d 676)

(2011).

> Even when the evidence is legally sufficient to sustain a conviction, a
> trial judge may grant a new trial if the verdict of the jury is "contrary to
> … the principles of justice and equity," OCGA § 5-5-20, or if the verdict
> is "decidedly and strongly against the weight of the evidence." OCGA
> § 5-5-21. When properly raised in a timely motion, these grounds for a
> new trial — commonly known as the "general grounds" — require the

trial judge to exercise a broad discretion to sit as a "thirteenth juror." In exercising that discretion, the trial judge must consider some of the things that she cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence. Although the discretion of a trial judge to award a new trial on the general grounds is not boundless — it is, after all, a discretion that should be exercised with caution and invoked only in exceptional cases in which the evidence preponderates heavily against the verdict, — it nevertheless is, generally speaking, a substantial discretion.

(Citations and punctuation omitted.) *White v. State*, 293 Ga. 523, 524 (2) (753 SE2d 115) (2013); see also *Walker v. State*, 292 Ga. 262, 264 (2) (737 SE2d 311) (2013); *Alvelo v. State*, 288 Ga. 437, 439 (1) (704 SE2d 787) (2011) ("Only the trial court is authorized by law to conduct . . . an assessment" of the witnesses' credibility in reviewing a motion for new trial brought pursuant to OCGA § 5-5-21.)

The trial itself was conducted by the Honorable G. Grant Brantley and a different judge reviewed Wiggins' motion for new trial. But while the discretion of the second judge in weighing the evidence is "narrower in scope" than the presiding judge's would be, *State v. Harris*, 292 Ga. 92, 95 (734 SE2d 357) (2012), "after a thorough review of the case, even a successor judge may exercise a significant

11

discretion to grant a new trial on the general grounds." *White*, 293 Ga. at 525 (2), n. 4.

Here, there is no evidence that the successor judge exercised discretion, weighed the evidence, and determined as the "thirteenth juror" whether the verdict was against the great weight of the evidence or offended the principles of justice and equity. The order denying Wiggins' motion for new trial shows that the trial court made only the legal determination that the evidence was sufficient under the standards of *Jackson v. Virginia*.

The State, however, argues that the trial court's citation to OCGA §§ 5-5-20 and 5-5-21 was an express indication that it reviewed the evidence under the discretionary standards of those statutes. To the contrary, the trial court's citation to these statutes is immediately preceded by the explicit legal finding that the evidence was sufficient to support the verdict and a citation to *Jackson v. Virginia*, and is immediately followed by a citation to *Valentine v. State*, 301 Ga. App. 630 (689 SE2d 76) (2009), a case that addressed only the legal standard of sufficiency of the evidence under *Jackson v. Virginia*. The trial court's citation to *Valentine* further reflects that the court did not exercise its discretion and weigh the evidence in addition to determining its legal sufficiency.

Accordingly, we vacate the judgment and remand this case to the trial court for consideration of the motion for new trial under the appropriate discretionary standard. Due to this holding, it is unnecessary for us to address the remaining enumerations of error at this time.

*Judgment vacated and remanded with direction. Boggs and Branch, JJ., concur.*